(No. 39512.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.*
ARTHUR GARDNER, Appellant.

*Opinion filed November 14, 1966.*

GEORGE C. ADAMS, of Chicago, appointed by the court, for appellant.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and ELMER C. KISSANE and KENNETH L. GILLIS, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

A jury found the defendant, Arthur Gardner, guilty of forcible rape and he was sentenced to imprisonment for not less than one nor more than ten years. The appellate court affirmed, (61 Ill. App. 2d 326,) and we granted leave to appeal. The only issue that we find it necessary to discuss is whether the defendant's guilt was proved beyond a reasonable doubt.

The complaining witness, Helen Davis, a widow, testified that at about 10:00 P.M. on September 15, 1963, her niece and her niece's husband, with whom she had been listening to records, left her small, two-room apartment on the second floor at 6028A Blackstone Avenue in Chicago. She locked the door of the apartment, put on a nightgown and house coat, and sat in the kitchen with her back to the bedroom door, about three steps away, to listen to some records before going to bed. The bedroom window, which opened onto a back porch and staircase, was three-fourths open, with partially drawn shades and a flowerpot on the sill. The screen on the window had been nailed on by her son. She heard a swishing noise, then a footstep, and "I automatically turned around and jumps up and I looked right in the man's face. And, when I did, he grabs me around the throat with both his hands." She identified the defendant as the intruder and testified that he told her not to look at him and not to scream, but to "Come and lay on the bed." She testified that intercourse followed, and that he apparently had a climax because "I was extremely wet." It was stipulated that a subsequent hospital test showed live sperm in her vagina. As the intruder left, she picked up a butcher knife. He slammed the door, and the sound aroused the neighbors. While some searched for the man, a "neighbor in the front called the police."

She testified that she was determined to get a good description of her assailant because she wanted to describe

him. "Every time he would say, 'Don't look,' why, I had to look down and not look in his face. When I'm looking down, I'm looking at his shoes and his pants." She said: "He had on these kind of big shoes like boot shoes. In other words, they're brogans, or something like that. And then, he had on some kind of blueish green pants or greenish blue pants, light, work, washable pants, and he had on a white shirt up here (indicating) and a kind of blueish greenish looking sweater." She also testified that he had long sideburns.

After the police arrived she was taken to a nearby hospital and examined. While lying on a table there, she told a detective "that I was positive that I could identify the man." The detective then brought in the defendant. "And, as soon as he come in with the fellow, I recognized him and told him that was the man." She said "he had on the same identical clothing that he had on when he came in my house."

On cross-examination, she testified that when the police had arrived at her apartment she had described her assailant as between 28 and 30 years old, six feet one inch tall, and wearing a blue or greenish blue shirt, and blue or greenish blue pants. At the trial she guessed the defendant's weight to be "at least 200 pounds. He was six feet tall, he had to be, because he take up my whole doorway."

Officer Jackson testified that he went to the apartment of the complaining witness about 11:15 P.M. on September 15, in response to a burglary call. When he arrived, she told him she had been raped. He took down notes as she described her assailant, and "put it on the air." These notes were later phoned onto a tape at the central police station and made up by someone else into a report. This report was read into evidence, and described the assailant as: "One male Negro, between the age of 29 and 30, six feet one inch tall, 160 pounds, light complexion, black short hair, wore blue shirt and blue fatigue pants." The officer had no independant recollection of the notes or the description as related

by the victim. He said that when he interviewed her she "was emotionally upset and hysterical."

Officer Carter testified that at approximately 11:00 P.M. on the night in question he was patrolling the area near the crime in a car and received a radio description of the assailant. At about 11:15 P.M. he saw the defendant walking east on the south side of 60th Street near University Avenue, about four and one half blocks from the victim's home. His official report of the arrest stated that it occurred at 12:50 A.M. the following morning. The defendant told officer Carter that he was going to his home at 7338 Kimbark and had just left the Regal Theater, at 47th Street and South Park Avenue. The distance between these locations is about four miles. He testified that the defendant said he did not know what movie he had seen, and that he had not been with anyone or seen anyone there. He seemed to be "sweating very profusely" and "to have been running or walking very fast," although on cross-examination Carter said it was a "fairly warm day," "pleasant."

Officer Carter took the defendant immediately to the hospital and into the room where the prosecutrix was. He testified that he had the defendant turn his back, and the prosecutrix raised herself on one elbow. "I turned Mr. Gardner around, and her eyes got wide and she said, 'This is the man. This is the man that raped me.' She kept repeating, 'This is the man, this is the man, this is the man.' " He testified that then "Mr. Gardner dropped his head. Thereafter, Carter gave the defendant a nude "head to foot narcotic search" and didn't find anything, but the defendant showed him "one ticket stub, I believe," which did not have a date or the name of the theater on it.

Detective Wallenda testified that he arrived at the hospital at about 12:45 A.M., and some time later he accompanied the victim back to her apartment. The bedroom screen was "pulled away" and the kitchen screen had been

removed completely. A dusting for fingerprints failed to reveal any prints suitable for comparison. He compiled a report from the victim and the arresting officer which indicated that the assailant was a male Negro, weighed 200 pounds, had light skin, wore "work pants and what she thought was a blue shirt." Asked on cross-examination whether the defendant was wearing that kind of clothing, Wallenda answered "No," but "green wash pants," "a little lighter than forest green." He estimated defendant's weight at about 225, 230 pounds. Asked about discrepancies in the description of the assailant's clothing and that worn by the defendant, he said that at the original interview the victim "could not describe the black boots, that he had been wearing, and also the sweater. He was wearing a leather type sweater or outer garment."

A Chicago police laboratory report which was received in evidence shows: "microscopic examinations of extracts taken from the fly area of the undershorts which the defendant was wearing at the time of his arrest revealed no spermatazoa or measurable amount of acid phosphatase activity."

Lonnie Lewis, manager of the Metropolitan Theater at 4644 South Park Avenue testified for the defense. He said that according to an "hourly report taken by the cashier every hour on the hour" the ticket stub in the defendant's possession when he was arrested, had been puchased between 7:00 and 8:00 P.M. on September 15. His records showed that two pictures, "The Balcony" and "The Trunk" were featured at that time. He did not know the actual running times of these films, but said that an average show runs about two hours, and on this assumption someone buying that ticket at 7:00 to 8:00 P.M. and staying through the show would get out at from 11:00 to 11:30 P.M. On cross-examination Lewis said he was not familiar with the contents of the films, and could not say that defendant was the purchaser of the ticket.

Solomon Clark, an insurance counsel for 52 years, testi-
fied that he was returning from church at about 11:15 or
11:20 P.M. on Sunday, September 15, and while stopped for
a traffic light at 47th Street and South Park Avenue, the
defendant called him by name and asked if he knew him.
He said he didn't, but when the other said he was "Arthur,"
who "used to be your paper boy," Clark "did remember hav-
ing a paper boy, about ten or twelve years ago, by that
name." He then gave defendant his card and drove off.
Clark said that he did not "know the exact date" when de-
fendant stopped him, that "it was sometime in September.
*  *  *  Probably around the 15th or 16th of the month."

On cross-examination Clark said that he was coming
from church at 3758 Wentworth Avenue and that the serv-
ices ended at 11:00 P.M. He was sure he saw defendant at
"fifteen or twenty minutes after eleven." Asked how he re-
membered the date to be Sunday, September 15, Clark re-
plied: "I didn't say September the 15th. I says, I don't know.
It must have been about that time.  *  *  *  I didn't keep
up with the date." He also testified that he was called on the
telephone and asked about his encounter with the defendant
a few days after it occurred. September 15, 1963, fell on
Sunday.

Dennis Morgan, a photographer, testified that he and
defendant's attorney had been at the victim's apartment the
night before the trial and took photographs. He measured
the bedroom window visually and estimated it to be about
30″ wide. He did not think he or the defendant could get
through it, although the complaining witness had testified
that the window was 33″ wide and defendant could climb
through "with all ease." Two character witnesses, Rev-
erend Frazier and Reverend Branham, testified to the de-
fendant's good reputation.

The defendant testified that he was 28 years old and
lived with his mother. He had worked steadily for a private
scavenger service before his arrest. On the day of his arrest

he had been to the Regal and the Metropolitan theaters, arriving at the Regal at 4:30 P.M. and at the Metropolitan "between seven-thirty and eight o'clock." At the Metropolitan he saw "The Balcony" and "The Trunk", and emerged from the theater at about 11:00 P.M. He had retained the ticket stubs from the theaters and these were in his possession when he was arrested. These stubs were admitted into evidence. He went to 47th and South Park, saw Clark, and the conversation he related was substantially the same as that narrated by Clark. Thereafter, he walked towards home by his regular route until he was stopped by the police. The weather was hot. At the hospital, he was taken into a room containing the complaining witness. Other than two officers, there was no one else present. "As soon as I got in the door real good, she say, 'That's him,' to the officer. The officer say, 'Is that him?' And she pointed out, 'That's him.' " He was at no time placed with others in a lineup for identification, either at the hospital or the police station. He stated he had never seen the woman before meeting her at the hospital and denied ever being in her apartment. He stated he was 6 feet 2 inches tall, weighed 265 pounds on September 15, 1963, wore dark blue pants, a white shirt, army boots, and a "black and white, black and yellow sweater."

Going to movies at 47th Street and South Park was his "regular Sunday routine." He walked past the corner of 47th Street and South Park every Sunday, but remembered meeting Mr. Clark on Sunday, September 15th. He said he first spoke to his attorney three days after his arrest, gave him Mr. Clark's card, and the attorney telephoned Clark. Clark's business cards were in defendant's wallet, a "folder" type, and were not discovered by the searching officer, who "didn't search the wallet real good." On arrest, he showed both theater tickets to the officers, and one was in his sweater, one in his "watch pocket." He said he had "a few" tickets at home and "just saves tickets, that's all." He always walked home by the same route from the shows at 47th

Street, a distance of about four miles. He had even walked home from downtown.

The defendant contends that his guilt was not proved beyond a reasonable doubt and we agree. The basic conflict in the evidence is between the strength of the identification testimony and the strength of the alibi. Nothing except the identification by the victim and defendant's proximity to the victim's apartment connected defendant with the crime. This court has often held that: "In a criminal case it is incumbent upon the prosecution to prove beyond a reasonable doubt not only the commission of the crime charged but also its perpetration by the accused. * * * And while the identification and whereabouts of the defendant at the time of the crime are questions for the jury, yet, where from the entire record there is a reasonable doubt as to the guilt of the accused, a judgment of conviction will not be permitted to stand. (*People* v. *Ricili,* 400 Ill. 309; *People* v. *Gold,* 361 Ill.23.) Where the conviction of a defendant rests upon identification which is doubtful, vague and uncertain, and which does not produce an abiding conviction of guilt, it will be reversed. (*People* v. *Fiorita,* 339 Ill. 78; *People* v. *Kidd,* 410 Ill. 271.) Neither can we disregard the evidence of alibi where the sole and only evidence contradicting it rests upon the identity of the defendant as the man who committed the crime. *People* v. *Peck,* 358 Ill. 642; *People* v. *De Suno,* 354 Ill. 387." *People* v. *McGee,* 21 Ill.2d 440, 444.

Although it is true that the testimony of a single witness, if it is positive and the witness credible, is sufficient to convict even though it is contradicted by the accused, (*People* v. *Pride,* 16 Ill.2d 82; *People* v. *Renallo,* 410 Ill. 372; *People* v. *Guido,* 25 Ill.2d 204, 208-09,) in this case the identification of the defendant by the complaining witness was weakened by several factors, while the defendant's alibi was positive and unimpeached. Her description of the assailant to the police, immediately after the crime, differs in significant respects from her testimony at the trial and from

the defendant's appearance at the time of his arrest. Immediately after the ocurrence she told the investigating offier that her assailant was wearing a blue shirt. At the trial she testified that he was wearing a white shirt. The record does not suggest that she told any investigating police officer that her assailant was also wearing a sweater, nor did she mention to them the heavy shoes or the sideburns to which she testified at the trial.

Although it is not necessary in every case to use a "line-up" to make identification testimony admissible, (see *People* v. *Boney,* 28 Ill.2d 505; *People* v. *Crenshaw,* 15 Ill.2d 458, *cert.* denied, 359 U.S. 997, 3 L. Ed. 2d 985,) the fact that one was not used affects the weight of the identification. (*People* v. *Mikka, 7* Ill.2d 454; *People* v. *Sanders,* 357 Ill. 610, 622.) "Of all the factors that account for the conviction of the innocent, the fallibility of eye-witness identification ranks at the top, far above any of the others." (Inbau, Book Review, 57 J. Crim. L., C. & P. S., 376.) The method of identification used in this case, which has been described as a "show-up", as distinguished from a "line-up", is particularly unreliable. Wall, Eye-witness Identification in Criminal Cases, (1966) pp. 26-29.

While the identification of the defendant is weak, his alibi was not effectively impeached. The manager of the Metropolitan Theater fixed the time when a ticket stub exhibited by the defendant at the time of his arrest was purchased, as between 7:00 and 8:00 P.M. on the night of the crime. His records showed that the movies which the defendant described at the trial were those exhibited that Sunday. The time estimated by the manager as the time that one who entered the theater when the ticket was bought would emerge from an average show matched the defendant's testimony, as well as the testimony of the witness Clark as to the time at which he talked to the defendant at the corner of 47th Street and South Park. The defendant testified that he told his lawyer about his meeting with Clark

three days after his arrest, and Clark's inability to recall the precise date of the Sunday in the middle of September when he saw defendant did not effectively impeach defendant's alibi. The defendant's alibi was not a recent concoction, for the complaining witness testified that she heard him say to the police "something about he went to a show or had been to a show," and the arresting officer testified that the defendant told him he had just left the Regal Theater but could not remember what movie he had seen.

Apart from the weakness of the identification and the strength of the defendant's alibi, there are other circumstances which militate against the defendant's guilt. At the trial the arresting officer testified: "At the time when I immediately made the first stop, Mr. Gardner was sweating very profusely, when I stopped him. He seemed to have been running or walking very fast." His official report of the arrest, however, made at 4:45 A.M., on September 16, stated: "I spotted the perpetrator, * * * walking very fast, east bound on 60th Street. I stopped him and questioned him as to where he was going and as to where he was coming from. He could not give an account of himself * * *. As I questioned him he began to sweat and get extremely nervous. I then placed him under arrest. * * *" Moreover, although the complaining witness testified that the defendant had reached a climax during intercourse and that she "was extremely wet", the police department's microscopic examination of the defendant's clothing "revealed no spermatazoa or measurable amount of acid phosphatase activity."

Upon these facts we do not have that "abiding conviction" of defendant's guilt that is necessary for an affirmance of the defendant's conviction. (*People* v. *Kidd*, 410 Ill. 271, 276.) Since it does not appear that the prosecution would be able to produce additional evidence upon another trial, the judgment of conviction is reversed.

*Judgment reversed.*