THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES PRESTON STARLING, Defendant-Appellant.

(No. 70-58;

Third District—February 10, 1971

*Rehearing denied March 10, 1971.*

STOUDER, J., dissenting.

Theodore A. Gottfried, of Defender Project, of Ottawa, for appellant.
James N. DeWulf, State's Attorney, of Rock Island, for the People.

Mr. JUSTICE ALLOY delivered the opinion of the court:

James Preston Starling was found guilty of forcible rape and sentenced to a term of from four to 15 years at a bench trial in Rock Island County. The sole question on review is whether the evidence was sufficient to establish that defendant was proven guilty beyond a reasonable doubt.

It is defendant's contention that he was not properly identified by the complaining witness and that his evidence established an alibi. Since we are concerned primarily with the facts as developed in the record in this cause, it is necessary that we discuss the evidence in greater detail than would otherwise be required.

Mrs. Ruth A. Simmons, age 64, the victim of the rape, lived in an apartment in Rock Island with an adult grandson. She was alone the evening of Sunday, October 26, 1969, and was in the kitchen preparing food at about 7:15 in the evening when she heard a knock at her door. The door was locked and also had a chain lock on it. She opened the door but left the chain lock on. The visitor, who was described by her as a "colored man", said he wanted to visit with her. She refused and the man pushed or pulled the door breaking the chain lock. Mrs. Simmons told the intruder to get out, but he struck her causing her head to go around "like a windmill". After she regained consciousness her attacker asked her if she was cooking supper for him. She told him that she was not and went to the kitchen to turn off the stove. He followed her and he turned off the stove. He then told her that if she tried anything he would kill her. He then struck Mrs. Simmons about 15 times on her face causing numerous bruises. Mrs. Simmons told the attacker, who was intoxicated, that she had no money but he said he was not after money. The attacker then took off his coat, came toward Mrs. Simmons and pushed her down on the bed and, while holding her with one hand, he raped her. She testified that, during the attack, she was wearing a housecoat and a half slip and that the attacker did not remove his underwear during the rape. During the act of intercourse, Mrs. Simmons was torn on her insides and bled quite extensively on herself and on the floor.

After the attacker left, Mrs. Simmons called the police and locked her door. The police received the call at 7:23 and they immediately went to Mrs. Simmons' apartment and took her to the hospital. One of the policemen picked up the bloody towel found in Mrs. Simmons' apartment. Officer Roy E. West was first to arrive at the apartment after the rape. He found Mrs. Simmons, who is white, sitting on the bed in the rear of her apartment. She told him she had been raped by a male Negro subject. She also told the officer that the attacker was wearing a black three-quarter length leather coat, black pants and a yellow sweater and was about 5 feet 7 inches tall. At this time, Mrs. Simmons did not mention

that there were any marks on her attacker's face. The officer observed a knife in the apartment which the attacker had held on Mrs. Simmons, but Mrs. Simmons was so upset she stated that she washed it after the attacker left. Consequently, there were no fingerprints on the knife.

Dr. Otis, Mrs. Simmons' personal physician, testified that Mrs. Simmons had contusions on both sides of her head and a laceration and contusion on her left breast. The doctor also testified that there had been intercourse with Mrs. Simmons within an hour or two before the examination and that this had caused vaginal bleeding.

Officer Geiger returned Mrs. Simmons from the hospital to her home in an automobile around 10:00 o'clock P.M. the evening of the attack. As he talked with Mrs. Simmons on the way to her home, she described her attacker as a male Negro, 22 to 23 years old, about 5 feet 9 inches tall and wearing a black three-quarter length coat, black pants and a yellow sweater. She also said her attacker had a scar on the right side of his face. As Officer Geiger and Mrs. Simmons reached Mrs. Simmons' apartment building, Officer West pulled up behind them. The two officers both noted a male Negro fitting the description given by Mrs. Simmons coming from the rear of Mrs. Simmons' apartment building. He was the defendant James Preston Starling. He was wearing a black three-quarter length coat, black pants, yellow sweater and a white shirt. The officers stated that the man had been drinking. Starling was led over to Mrs. Simmons and while he was about one or two feet away, Mrs. Simmons identified Starling as the man who had raped her. Starling was then arrested and taken to the police station.

Mrs. Simmons again saw Starling at the preliminary hearing. She was later shown several photographs by the police and she picked out the picture of Starling as the man who raped her. During the trial, Mrs. Simmons identified Starling in open court as the man who raped her. She was cross-examined thoroughly about her eyesight, as she expressed some concern about being able to see when being shown the pictures of her apartment. When she was shown a photograph of the inside of her apartment, Mrs. Simmons said, "It looks familiar, but I can't really tell you, there's the door there, I don't know whether he took this  *  *  *  is this supposed to be inside?". She then said she couldn't see very well without glasses. It was shown that Mrs. Simmons did not have her glasses on during the rape or when she identified defendant on the street in front of her apartment. She also testified that in 1942 she had injured her eyes and had lost her eyesight for about two years but had regained her sight. She further said that one eye specialist stated that she had cataracts and that one told her that she did not have cataracts. Mrs. Simmons also stated that she did not wear glasses now and could see all right without glasses.

On redirect examination she described details and photographs taken of her apartment and she described the defendant's appearance and clothing the defendant was wearing in court from a distance of 12 feet. At a distance of 4 feet she could tell that he had dark eyes. She also stated that the man who raped her said he would be coming back at 11:00 o'clock the next night. She identified the towel introduced in evidence as the one she used to wipe blood from her body after the rape. There was no direct testimony as to the lighting in the Simmons apartment during the rape, other than the fact that Mrs. Simmons was working in the kitchen preparing food when the attacker entered. There was no showing that any lights were turned off during the time the man was in her apartment. A witness, Joe Earl Howard, a cousin of defendant, placed defendant in the Bridges' apartment across the hall from Mrs. Simmons apartment the evening of the rape. This witness stated that he saw the defendant in the Bridges' apartment at 6:00 o'clock P.M. when Howard went to sleep.

Julia Bridges who lived in the apartment with Joe Earl Howard was also called as a witness for the State. She testified that Starling was in her apartment with her and two other men the afternoon and early evening of the day of the rape. She saw Starling leave about five minutes after seven in the evening and stated that she saw him walk outside of the apartment building.

Officer West also testified for the State. He was one of the officers who arrested Starling and was present at the police station when defendant removed his clothing. Officer West testified that there was blood on defendant's undershorts when defendant removed them in the police station around 10:30 the evening of the rape. West further stated that he found no blood on any of defendant's other articles of clothing.

Defendant's evidence consisted of alibi witnesses and testimony to explain the presence of blood on his undershorts. Defendant stated about 1:00 P.M. on Sunday, October 26, 1969, he was in the Clover Club in Rock Island and drank beer with a friend. They left, visited a friend's house and then another tavern, where the defendant drank beer, and about 4:00 to 4:30 in the afternoon he got to Joe Howard's apartment. This was the Julia Bridges apartment across the hall from Mrs. Simmons where Joe Howard and Julia Bridges lived together. There were three men at the Joe Howard apartment, defendant, Joe Howard and a man named Felix. Julia Bridges testified that she arrived at the apartment about 5:00 P.M. and that defendant was in the apartment. She said she had been with the three men earlier in the afternoon and they had been drinking and had continued to do some drinking in the apartment after 5:00 P.M. She said that Joe Howard was intoxicated and that all three men fell asleep. She remembered that Starling left the apartment about five minutes

after seven that evening. She did not know how much defendant had to drink that day but she thought he was not drunk. As we have indicated, she stated that she saw Starling walk out in the alley. Starling testified that after he left the Bridges apartment he walked to the Charles Speights house seven or eight blocks away and that he arrived there four or five minutes after he left the Bridges' apartment.

Mr. and Mrs. Speights stated they were just arriving home in their car and that Starling was there. They stated they arrived home about 5 or 10 minutes after 7:00 P.M. as Speights wanted to be home in time to watch the Bill Cosby Show on T.V. Speights said that after sitting in the house with Starling a few minutes he and Starling left and went to Duncan's Liquor Store arriving there about 7:30 to 7:35 P.M. They then drove down Ninth Street and drank some liquor and picked up a friend.

William Starling, defendant's brother, testified that he saw defendant about 7:35 P.M. at his aunt's house when defendant stopped by for a short visit. He also remembers the time as he had just begun to watch the Bill Cosby Show. At about 10:15 P.M. defendant asked a friend to take him to his cousin, Joe Howard's house. Defendant stated that he went into the building, and when Julia could not waken Felix, defendant left and was apprehended by police in front of the apartment.

When Julia Bridges was testifying for the State, on cross-examination, she told of seeing a Bob Kittrell drive up in the alley about 7:30 and that he left his car and went into the back of the building. She said she saw him leave in a hurry about 10 or 15 minutes later. This was the first time Julia mentioned that she had seen Kittrell in the vicinity of the apartment on the day of the rape. She said she had never mentioned him before when interviewed by the authorities because she didn't think it was important.

Officer Jack Geiger testified that he saw the defendant Starling in Duncan's Liquor Store about ten minutes after 6:00 on the evening of the rape. He knew Starling and saw him through the window in the lighted liquor store. He stated that Starling was wearing a three-quarter length black coat, a yellow sweater and black pants at the time. He also stated that Starling was intoxicated. He was specific as to the time, since he ate in the evening from 5:30 to 6:00, and then went directly to the area of the Duncan Liquor Store. He was also one of the officers who participated in defendant's arrest later that same evening.

Defendant's mother testified that when defendant was about 6 years old he fell on an iron, and that ever since he passes some blood when he urinates and that she had seen this on his underwear. Defendant testified that he did not remember any blood stains on his shorts the night he was arrested, but said he has had blood stains as he had a hernia operation

about three or four weeks before he was arrested. On cross-examination, defendant said his hernia operation was in June and that he still bled from the operation and sometimes passed blood when he urinated. He stated the blood on his shorts when he was arrested could have been from the hernia or from a girl he was with the night before. An employee of the Sheriff's office testified that he examined the defendant and found a scar on defendant's abdomen which was completely closed. He further stated that in his periodic work at the jail, in examining defendant's laundry, he never observed any blood on any of defendant's underclothing while defendant was in custody.

■■ The function of a court of review, when an issue of the character presented to this Court is raised, it is not in controversy as between the parties. The same issue was raised in *People v. Guido*, 25 Ill.2d 204, where a defendant in a bench trial was found guilty of selling narcotics. The court there stated, at page 208:

"In the absence of a jury, the credibility of witnesses, the weight to be given their testimony and the inferences to be drawn therefrom are for the trial judge and, upon review, we will not substitute our judgment for his unless it clearly appears there is reasonable doubt of the defendant's guilt (*People v. Barney*, 15 Ill.2d 503; *People v. Morrison*, 23 Ill.2d 201.) A conviction will not be set aside merely because the evidence is contradictory, and a conviction depending upon the weight of the evidence will not be set aside except to prevent an apparent injustice. (*People v. Arnold*, 2 Ill.2d 92; *People v. Pride*, 16 Ill.2d 82; *People v. Lynumn*, 21 Ill.2d 63.) Here it was the province of the court, who was no doubt aware of the interest of the opposing witnesses in the outcome of the trial, to determine the truth of the matter between the evidence tending, on the one hand, to show defendant's guilt of the crime charged and, on the other, to establish defendant's denial of guilt and a suggestion of alibi. Upon a review of the entire record we are convinced the evidence fully supports the judgment of the trial court."

As also stated in *People v. Arnold*, 2 Ill.2d 92, at page 95, the question is whether a court was justified in finding defendant guilty where the testimony of witnesses was conflicting. The court there emphasized that the testimony of one positive and credible witness is sufficient to convict even though that witness is contradicted by the accused. As stated in *People v. Barney*, 15 Ill.2d 503, at 507:

"It was the special province of the court, sitting as the trier of facts, to determine the credibility of witnesses, and its finding of guilty must stand unless we can say that the proof is so unsatisfactory as to justify us in entertaining a reasonable doubt of defendant's guilt."

■■ In applying this test to the cause before us, we must carefully examine the evidence. The only identification witness was Mrs. Simmons, the victim of the rape. Defendant attempts to cast doubt upon Mrs. Simmons ability to identify the defendant, but the record shows that Mrs. Simmons had both the opportunity and the physical ability to identify the defendant. Her eyesight was questioned when she had some trouble identifying a photograph of her apartment which was being offered in evidence. A reading of her testimony, when she was being questioned about a photograph, shows that her confusion was not so much an inability to see the photograph, but rather in determining exactly were the photograph was taken. She did state, "I can't see very good without glasses," but on cross-examination she said she didn't need her glasses and could see good enough without them. She might have had cataracts, but one specialist said she had them and another one said she didn't. She demonstrated her ability to see in open court by describing defendant's clothing and characteristics from some distance away. The trial judge observed Mrs. Simmons in the court and he could tell she was able to see when shown photographs and other articles offered in evidence. He saw her as she described the defendant in court from twelve feet away. The conduct of Mrs. Simmons as she observed things with her eyes is very important and a written record cannot properly reflect this. We feel that the trial judge is in a better position to determine how well Mrs. Simmons could see than we can on review. He must have determined that she could see well enough to identify the defendant clearly and there is ample evidence in the record to support such conclusion.

A suggestion is made, by defendant, that Mrs. Simmons had no chance to observe the man's face. This is not sustained by the record. The testimony of Mrs. Simmons showed she first observed him through the partially opened door, and then when he forced his way in she saw him face to face. After he struck her she was dizzy, but recovered enough to walk to the kitchen and the man followed her and in fact turned off the oven. She thus had a chance to observe him again face to face in the kitchen. It was after all this that the man struck her about 15 times, a factor which might have impaired her ability to see her attacker from that point on. Just prior to the rape she testified that she saw the man remove his coat and thus observed him during this period. During the course of the rape the man was on top of her and very close to her so that she could hardly miss seeing him. Her testimony showed that the man was in the apartment for about 15 minutes and he was in her immediate presence nearly all of that time, and part of that time his face was very close to Mrs. Simmons. The record, therefore, discloses that she had ample opportunity to see the man before he inflicted his severe beating and during the rape.

■■ Defendant also raises the question of the lighting in the *Simmons* apartment at the time the attacker was present. There was no testimony in the record with respect to the lighting. Mrs *Simmons* testified that she was preparing food when the attacker knocked at the door. He forced his way in and shortly they were back in the kitchen. There was no testimony that Mrs. Simmons and her attacker ever turned off any lights and it is reasonable to assume that her apartment, particularly the kitchen where she was working, had normal lighting. If defendant wished to show some impairment in the apartment lighting which would have affected the identification, he should have questioned Mrs. Simmons about this. The case of *People v. Appleby*, 104 Ill.App.2d 207, cited by defendant has no application. In the *Appleby* case, the evidence disclosed that the man who entered the apartment at night turned off nearly all the lights. The lack of lighting was only one of many factors in that case upon which the court relied in reversing. Notably, the attack occurred while the victim was in her bed. Her four children were also there sleeping and none of them woke up. Also, it was three days following the rape before the victim reported the rape to the authorities.

■■ Defendant also points out that Mrs. Simmons did not mention that the attacker had a scar on his face when she gave the first description to the officer who came to her· apartment. While this was true, it is important to note that on the way back from the hospital, before the defendant was apprehended, Mrs. Simmons gave another description of defendant which was nearly the same as her original description except that she did mention the scar. Thus the description of the scar was made before she saw defendant or his picture. Her description of the attacker, and his clothing, given before she went to the hospital was nearly identical to the description given on the way back from the hospital, and the description fitted the defendant in nearly every respect. This was not a case of identification by clothing alone, as was the case in *People v. Kincy*, 72 Ill.App.2d 419, cited by defendant.

■■ Defendant also argues that the identification of defendant by Mrs. Simmons on the street outside her apartment was inconclusive. Mrs. Simmons testified, as did two police officers, that Mrs. Simmons was one or two feet away from defendant when she identified him outside her apartment the night of the rape. From this testimony it is reasonable to conclude that Mrs. Simmons had an adequate opportunity to see the defendant when she identified him in front of her apartment.

■■ Defendant further contends that Mrs. Simmons was under a sedative at the time of the identification. While this was true, the testimony of the officers with Mrs. Simmons at the time showed that they observed nothing

in the physical condition of Mrs. Simmons which would impair her ability to make an identification.

██ Defendant also stresses that there was no line-up where Mrs. Simmons could pick out the defendant. There is no requirement that a line-up be held and it is obvious in the instant case why a line-up was not used, as defendant was apprehended in the presence of the victim near her apartment. In the case of *People v. Gardner*, 35 Ill.2d 564, cited by defendant, the court stated that lack of a line-up only affects the weight of the identification. In considering Mrs. Simmons close physical observation of defendant when he was in her apartment and her detailed description of him two times to the police, the fact that there was no line-up should not discredit the positive identification made by her in the cause before us.

██ Defendant also contends that it was error for the trial court to disregard the alibi evidence offered by defendant. There was some discrepancy in such testimony of friends and relatives of defendant. For example, Julia Bridges testified that she watched Starling leave her apartment from her living room window, but later in testifying for the defendant, she stated she was in her bedroom with Joe Howard when Starling left the apartment. Defendant also testified that he walked about seven or eight blocks to the Charles Speights house and arrived there in four or five minutes. This would require that he move very rapidly as a person would be required to jog at a steady pace to cover a block in thirty seconds. The testimony of the alibi witnesses was also seriously questioned, when the testimony of Officer Geiger indicated that he had observed defendant in Duncan's Liquor Store at 6:10 P.M., at a time when Julia Bridges testified that defendant was in her apartment. If the testimony of Officer Geiger was to be believed, it could have raised a question about the authenticity of defendant's entire alibi story, in the mind of the trial court.

We note from the record that Mrs. Simmons saw the attacker at close range for about 15 minutes and gave a detailed description of him before leaving for the hospital and that such description included height, weight, age and clothing. On the way home from the hospital she again described him making only a moderate change in the height and adding the factor of a scar. This was before she ever saw the defendant in person after the rape or even saw a picture of him. The defendant, when apprehended in front of Mrs. Simmons apartment, fit the description given by Mrs. Simmons in every detail including the scar. There was also testimony which placed defendant in the hall outside Mrs. Simmons apartment at the exact time of the alleged rape. Julia Bridges testified that defendant left her apartment at five after 7:00 and she lived across the hall from Mrs. Simmons.

There was conflicting testimony as to how blood got on defendant's undershorts. The police officer who handled defendant's laundry when he was in jail testified that he observed no blood spots on any of defendant's clothing while he was in jail after the rape.

■■ The circumstance that Mrs. Simmons was shown some photographs prior to the actual trial, including a picture of Bobby Kittrell (who was mentioned by Julia Bridges), and that Mrs. Simmons continued to identify Starling as the person who committed the rape, does not, in our opinion, justify a conclusion that the trial court should have found that there was a reasonable doubt as to the guilt of defendant. Kittrell did not resemble Mrs. Simmons' description of the rapist.

On the basis of the record, therefore, we do not believe we would be justified in reversing the judgment of the Circuit Court of Rock Island County. The judgment of such Circuit Court will, therefore, be affirmed.

Judgment affirmed.

RYAN, P. J., concurs.

Mr. JUSTICE STOUDER dissenting:

I do not agree with the majority of the court. I am not satisfied the evidence establishes defendant's guilt beyond a reasonable doubt.

The principal problem presented on this appeal arises from the strength and weaknesses of the identification testimony as compared with the alibi evidence. This problem was extensively considered in *People v. Gardner*, 35 Ill.2d 564, 221 N.E.2d 232, in relation to facts substantially similar to those in this case. In *Gardner* the Court discussed both generally and particularly the inherent frailty and potential fallibility of the observational process. The Court discussed the application of the rule which as stated by the majority asserts that the testimony of a single witness if positive and credible is sufficient to sustain a conviction even where such evidence is contradicted by defendant or his evidence. The Court's reversal of the conviction in *Gardner* and its reasons therefore indicate that the identification testimony of a single witness is not positive and credible merely because expressed in unequivocal terms in open court.

The customary and accepted practice of in court identification permits the assertion of identification as a positive fact which tends to obscure its major ingredient, that of a preceptual opinion. When a witness announces from the witness stand "that is the man who assaulted me" the question arises by necessary implication, "why?". Generally the response to such question if asked is that "he looks like the man". We commonly accept this method of testimony. If the identification is expressed in terms of "I believe", "I think", or "he looks like" which are more in accord with the

mental process involved, the effect of the testimony is diminished. The testimony may be considered doubtful because of the failure to express identification in terms of vehement conviction.

The nature of eye witness identification as a perceptual process has in recent years received considerable examination. (See *U.S. v. Wade*, 388 U.S. 218, *Gilbert v. State of California*, 388 U.S. 263, *Stovall v. Denno*, 388 U.S. 293, *Simmons v. U.S.* 390 U.S. 377, *People v. Gardner*, 35 Ill.2d 564, 221 N.E.2d 232, *People v. Blumenshine*, 42 Ill.2d 508, 250 N.E.2d 152 and *People v. Caldwell*, 117 Ill.App.2d 64, 253 N.E.2d 904.) It is not sufficient to sustain a conviction where identification of the accused is the principal controversy by holding that so long as there is "some" or "any" evidence supporting the conviction the resolution of the issue is solely the responsibility of the trier of fact. Where the underlying basis of an in court identification is doubtful or uncertain the unequivocal in court identification is not thereby rendered positive and credible.

My belief that the conviction in this case is not sustained by the evidence is based primarily on the weakness of the identification evidence as compared to the alibi evidence. The probative value of the eye witness identification testimony depends primarily upon the powers and facilities of the observor and the conditions of observation. Additionally events taking place after the observed event may confirm, impeach or distort the final conclusion. If the in court identification testimony lacks an adequate supporting basis the effect of the in court testimony is that of accusation rather than identification.

There are several aspects of the prosecution evidence which in their accumulative effect diminish the probative value of such evidence. Of initial concern to me are the impaired mental and physical faculties of the complaining witness. During her direct examination the following took place, "Q. Is this the entrance to your house—referring to Plaintiff's exhibit #4? A. It looks familiar, but I can't really tell you, there's a door there, I don't know whether he took this—is this supposed to be inside? Q. You have to tell me? A. I can't see very good without glasses. There is a door that goes from the outside comes in to the hall, comes up to my apartment.". On cross examination the witness admitted that she might have cataracts, and couldn't see too well. In response to whether she wore glasses the witness stated "no I don't wear them any more, I said it don't do me any good, I can see alright.". According to her testimony she was not wearing glasses at the time of the assault, at the time of the identification of defendant later the same evening or at the trial. Decreased visual acuity does not in and of itself render a conclusion based thereon incompetent but it is a factor affecting the credibility of such testimony. The prosecution endeavored to overcome the adverse effects of the witness's

impaired vision by in court demonstrations. Such demonstrations were superficial, carried on under ideal circumstances not present when prior observations were made, and indicated only a gross ability to see. Admittedly the visual faculty and power of observation of the complaining witness were impaired. Whether her confused testimony was the result of poor vision or of poor orientation as is suggested by the majority, does not obviate a doubt concerning her observational processes. Nor can I accept the argument of the State that the impaired abilities of the complaining witness ought to be ignored because otherwise offenders may attack such persons with impunity. The persuasive burden of the prosecution may not be diminished merely because the persuasive evidence may not be available.

Also affecting the complaining witness as observor was the physical mistreatment which she received and the mental shock of the whole incident. According to her own testimony she was dazed and only partially conscious from the moment the intruder pushed open the door. According to the complaining witness after assailant burst through the door "he hit me so hard, knocked me from the door to the bathroom where I had to hold on to one of those rods, I got so dizzy and my head went around like a windmill.". Later her assailant struck her fifteen or twenty times on each side of the head.

This brings me to the lighting conditions at the scene together with the conditions and opportunities of observation. A review of the complaining witness's testimony reveals a complete absence of any testimony regarding lighting conditions. Even more perplexing is the absence of any testimony relating to if, when and under what circumstances the witness saw the attacker's face or otherwise observed her attacker. The complaining witness testified that she was working in her kitchen at about 7:15 P.M. From her description of her attacker's conduct and particularly his clothing the State argues that the rooms must have been well lighted but such argument finds no support in her testimony.

In *People v. Appleby*, 104 Ill.App.2d 207, 244 N.E.2d 395, the court in commenting unfavorably upon observational conditions stated, "* * * she, at no point, gave indication of the quality of illumination in proximity to the scene of the attack. We know only that the lights in the bathroom and a closet, 'in the back' had not been turned off by the assailant. No evidence was adduced to demonstrate the relationship these illuminated areas bore to the bedroom. The prosecutrix said only that it was light * * *". The foregoing observation was only one of many reasons for reversing the conviction in Appleby, there being other reasons apropos of the case at bar adversely affecting the probative value of the identification testimony.

In this case there is no evidence that any lights were on let alone

testimony regarding illumination of the attacker. From her in court identification the majority seems to have adopted the position of the State, namely that the arera must have been lighted and that the complaining witness must have observed her assailant "face to face" or at close range. As can be seen from the majority opinion no testimony is referred to supporting such assertions and while the State might like to have the evidence viewed in this manner the unhappy fact is that the evidence is just not there.

So far as lighting is concerned, the majority suggests it was the duty of the defendant to prove the lights were off, a conclusion with which I do not agree. The evidence supporting the State's case must stand or fall on its own merits or demerits and its failure to present significant evidence concerning an important issue can not be excused by shifting the responsibility to the defendant.

Likewise as in *People v. Kincy,* 72 Ill.App.2d 419, 219, N.E.2d 662, which reversed a robbery conviction, there is an absence of testimony by complaining witness as to when and under what circumstances she saw her assailant or observed the features apparently relied on to support an in court identification. Identification which lacks an observational foundation is a delusion. Such observational foundation may not be implied from the identification itself.

The victim's in court description of her attacker demonstrates the paucity of observational detail and when compared with other descriptions allegedly given by the victim there are significant discrepancies. Such descriptions are likely to vary to some extent in any retelling. Rather than bolstering or supporting the victim's identification testimony as the State intended such descriptions are part of the cumulative circumstances casting doubt on the victim's identification of defendant. The only testimony of the victim regarding the description of her attacker is as follows, "Q. Do you remember how the man was dressed before this happened? A. Yes, he had on a dark suit, dark pants, a top coat and I don't know whether he had any other coat on, he just had on the one coat. Q. I want to call your attention to plaintiff's exhibit #7. I withdraw the question. Was there anything about the man that was there in your apartment that night that you would remember about him? A. I don't know what you mean. Q. Anything about his face, or identifying marks? A. No, but he had a scar on his face, a small scar.".

When such testimony is compared with the description the victim was alleged to have given to the police officer it is not easy to conclude that the descriptions were given by the same observor.

As noted above, the State's Attorney started to inquire of the witness concerning the identification of the State's exhibit #7 which was the

yellow sweater jacket worn by defendant at the time of his arrest. The reason for the withdrawal of the question is apparent. The witness in her prior account for all practical purposes precluded any identification of such jacket.

Officer West testified that the victim gave the following description of her attacker when he talked to her in her apartment just before she was taken to the hospital. "Q. What, if anything did she say? A. She said that she had been raped by a male Negro subject. Q. Was there any other description given? A. Yes, she said he had a black leather coat, black pants, yellow sweater and white shirt, and that he was about 5 feet 7 inches." In response to a specific question West further testified that the victim did not mention any scar on the face of her attacker.

Officer Geiger's testimony concerning the description given him by the victim is substantially the same as that of West except Geiger indicates that the victim referred to a scar.

The descriptions of the assailant which officers West and Geiger testified were given to them by the victim do describe defendant. Whether such descriptions were in fact given by the victim or were descriptions arrived at after the defendant was arrested is at least doubtful in view of the testimony. As indicated earlier, the description by Mrs. Simmons as stated in open court is inconsistent with the description she purportedly gave to the officers. Additionally it should be noted there is nothing in the victim's testimony that she gave any description to either officer and in fact her testimony regarding any description given to Geiger is to the contrary. Neither officer testified as to any independent recollection of conversations with the victim unrefreshed by reports made at the time of the incident. Nor is there any evidence that any reports including such descriptions were made prior to defendant's arrest. The testimony of officers West and Geiger was largely hearsay. Although not objected to, such hearsay testimony may not be considered independent evidence supporting the conviction.

This brings me to the identification of defendant by complaining witness after she had returned from the hospital at about 10:30 P.M. The record reveals that the identification was not a spontaneous act by the complaining witness. As they were approaching the apartment she did not see the defendant from her vantage point in the police car and declare he was the one. Instead the defendant was intercepted and stopped by two police officers, brought to the area of the police car and, according to the complaining witness, she was asked to identify him which she did. Again there is the absence of significant testimony regarding the lighting conditions and indeed most of the testimony would indicate that the area was dark thereby casting doubt on the identification. There is some

general reference to a street light but Officer West could not recall where the street light was. Officer Geiger, the other policeman present, does not mention lighting in his testimony. According to defendant Starling it was dark and the complaining witness did not even look at his face but only at his clothing. Joe Jones who was waiting for Starling and who observed the scene from his car parked some three car lengths away, stated that the area was dark and not lighted by the street light. Prior to the time of making this identification the complaining witness had received a sedative and according to West she declined to come to the station house a short time later to make a report because she was too sleepy.

No claim is made that the identification procedure might have been impermissibly suggestive (*U.S. v. Wade*, 388 U.S. 218) or that the testimony of the police officers may have been incompetent hearsay (*People v. Wright*, 124 Ill.App.2d 223, 260 N.E.2d 265). In my view of this case it is not necessary to determine the competence of the identification testimony but the rules suggested in the foregoing cases are of significant value in considering the probative value of the identification testimony. If the area was dark as the witnesses testified or if evidence of lighting is absent, the purported identification is irrelevant as a test for either supporting or detracting from the victim's in court identification. If the victim had failed to identify the defendant at this confrontation but later identified him in open court the adverse circumstances surrounding the identification scene could easily explain such failure. If, notwithstanding the absence of evidence favoring the observational process, it might be said that meaningful observation could take place the identification is still subject to a weakness of undue suggestiveness. The potential for erroneous identification in a one man confrontation has been amply discussed in such cases as *Wade, supra* and *Blumenshine, supra*. In this connection it should also be noted that the testimony of West and Geiger was hearsay and is of no independent value in buttressing the victim's testimony notwithstanding its apparent introduction for that purpose.

The last witness presented by the prosecution in its case in chief was police officer Smiley. His testimony included the disclosure that prior to commencement of trial on that morning he had exhibited a series of six photographs to the complaining witness for the ostensible purpose of refuting any suggestion that one Bobby Kittrell was the assailant. According to Smiley the complaining witness identified the defendant and not Kittrell from the group of photgraphs.

In this connection the Bobby Kittrell matter deserves explanation. As earlier outlined in the facts, Julia Bridges and Joe Howard initially testified for the prosecution, their testimony being introduced for the purpose of tending to prove that Starling was in the area at the time of the commis-

sion of the offense. During Julia Bridge's cross examination she indicated that Bobby Kittrell had lived in the apartment building at the time of the offense, that she had seen him drive up behind the apartment building at about the time of the offense, come in and leave about ten minutes later. In his direct examination of Joe Howard the State's Attorney asked him whether Julia had told him anything about Kittrell. Howard indicated that Julia had mentioned Kittrell the following evening after he had returned from work and that she had expected Kittrell to be in jail for the offense further indicating that this information had come from Mrs. Simmons. The prosecuting attorney appeared to be surprised at this turn of testimony and sought to cast doubts on the testimony because each witness had failed to mention Kittrell when interviewed by representatives of the State's Attorney's office. The witnesses explained their failure to mention Kittrell on the grounds that they had not been asked about him or anyone else other than Starling.

Officer Smiley's testimony concerning the morning exhibition of photographs to the complaining witness was clearly incompetent hearsay, condemned in *People v. Wright*, 124 Ill.App.2d 223, 260 N.E.2d 265, *People v. Denham*, 41 Ill.2d 1, 241 N.E.2d 415 and *People v. Turner*, 91 Ill.App.2d 436, 235 N.E.2d 317. As heretofore noted much of the testimony of officers West and Geiger was also hearsay and although defendant did not object to such testimony the surplus of hearsay testimony tends to obscure the paucity of competent probative testimony. The necessity of resort to or presenting such incompetent evidence reveals not only the weakness of the prosecution's case as a whole but particularly the weakness of the testimony of the complaining witness. If it had not been for officer Smiley's incompetent testimony the record would have failed to reveal the inexcusable and highly prejudicial photographic identification. As pointed out in *Simmons v. U.S.* 390 U.S. 377 and *People v. Caldwell*, 117 Ill.App.2d 64, 253 N.E.2d 904, a witness's in court identification may well be affected by a prior photographic identification and the witness may well be identifying the person identified in the photograph rather than the offender. See also *U.S. v. Zeiler*, 427 Fed.2d 1305 and also dissent in *People v. Brown*, (Ill.App.2d). Each of the foregoing cases concludes that the use of photos prior to the apprehension of the offender is a necessary and proper step in the investigatory process. There is however no such justification for exhibiting photographs to a witness prior to her testimony in open court. Where, as in the case at bar, the complaining witness, due to impaired faculties, evidences poor powers of discrimination the subsequent in court identification is rendered nearly valueless.

The exhibition of the photographs by implication reveals another disturbing facet of this case. The prosecution even prior to the commence-

ment of the trial and prior to the testimony of Julia Bridges and Joe Howard, was aware of the possible involvement of Bobby Kittrell as the offender. The only apparent source of information regarding Kittrell was the complaining witness herself since it is her identification which is the whole case. In fact the hearsay testimony of Howard concerning Kittrell's implication in the offense by Mrs. Simmons stands unrebutted in the record.

In view of Mrs. Simmons' last minute identification of defendant from the photographs the prosecution had no alternative except to proceed against defendant since otherwise there would be little prospect that anyone else could be charged or convicted of the offense.

In his only reference to defendant's alibi in his findings the trial judge observed, "* * * defendant's alibi of one Kittrell being in the area at the time of the alleged rape was not worthy of belief, in view of the clear and convincing testimony of the complainant * * *". This observation by the judge is difficult to understand. All of the testimony regarding Kittrell was presented by witnesses testifying in behalf of the prosecution. The observation also suggests that perhaps the defendant had some duty regarding the Kittrell issue which he had failed to assume. That Kittrell may have been the assailant was not defendant's alibi but instead his defense was that he had been some place other than in the Simmons apartment at the time of the offense.

This brings me to the question of whether there is any evidence to corroborate the identification of defendant by the complaining witness. Prosecution urges that the stained undershorts constitute corroboration. At best the inferences which may be drawn from the stained undershorts are equivocal and the corroborative effect doubtful. As indicated earlier it appears that laboratory examination was attempted but absent evidence of the results thereof it can not be said that the stains were blood of the victim or that such blood stains were not the result of defendant's own bleeding. Defendant's claim of passing blood both prior and after his operation was confirmed by the testimony of his mother. Affording additional support to the inference that such stains were the result of the defendant's own bleeding rather than the victim's was the testimony of the police officer originally receiving the clothing. According to his testimony he examined the fly area of the trousers carefully and was unable to find any stains either on such area or on any other clothing of defendant. According to the testimony of the complaining witness concerning her vaginal bleeding and the circumstances surrounding the assault it is difficult to understand how staining of the attacker's trousers could have been avoided.

Four witnesses supported defendant's alibi. Their testimony generally

covering the time period from 5 P.M. until 8:45 P.M. supported the defendant's testimony and was inconsistent only in minor details as might be expected. That they were friends or relatives of defendant does not require that their testimony be disregarded nor can it be said that their testimony was a recent concoction or fabrication as in *People v. Guido*, 25 Ill.2d 204, 184 N.E.2d 858. The charge of concoction by the prosecution is based on the fact that the witnesses referred to the Bill Cosby television show which came on at 7:30 P.M. to support their estimates of time. Since these witnesses were black and since the Bill Cosby show significantly appeals to blacks no sinister or improbable motives can be attributed to the witnesses.

I believe that the observation of the court in *People v. McGee*, 21 Ill.2d 440, 173 N.E.2d 434, as approved in *People v. Kincy, supra,* is applicable to the facts in the case at bar. In that case the court stated, "Taken in conjunction with the uncontradicted evidence of an alibi, which is neither improbable nor such as taxes credulity we are of the opinion there was not such positive identification here which fairly or reasonably supports the conviction.". In my view the evidence when viewed fairly and reasonably fails to produce an abiding conviction that defendant was guilty beyond a reasonable doubt.